IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

SCARLETT REYNA and MARIA          *
ORTEGA,
                                  *
        Plaintiffs,
v.                                *
                                      CASE NO. 3:04-cv-39 (CDL)
                                  *
CONAGRA FOODS, INC. and           *
PILGRIMS PRIDE CORPORATION
OF DELAWARE, INC. as              *
Successor-in-Interest to
CONAGRA POULTRY COMPANY,          *

        Defendants.               *


# O R D E R

     Currently before the Court is Defendants' Motion for Summary

Judgment.  For the following reasons, Defendants' motion [Doc. 30] is

granted in part and denied in part.


## BACKGROUND

     This case arises from ConAgra Foods, Inc.'s ("ConAgra")

termination of the employment of Scarlett Reyna ("Reyna") and Maria

Ortega ("Ortega") (collectively, "Plaintiffs"). Plaintiffs, Hispanic

females, allege that while employed at ConAgra, they were subjected

to discrimination, a racially hostile work environment, retaliation,

and ultimately, termination because of their efforts to report

discriminatory, fraudulent, and unlawful acts by their superiors.

Plaintiffs allege causes of action under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the

Civil Rights Act of 1991, 42 U.S.C. § 1981; the Age Discrimination in

Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, *et seq.* ("SOX"); the Fair Labor Standards Act, 29 U.S.C. § 207 *et seq.* ("FLSA");[1] and the laws of the State of Georgia. Construed in the light most favorable to Plaintiffs, the record establishes the following facts.[2]

From 2000 to November 2003, ConAgra owned and operated a poultry processing plant in Athens, Georgia. Reyna began working there on March 9, 2001, and Ortega's employment started on September 10, 2001. They both were terminated on September 17, 2003.[3] At all times relevant to the present motion, Plaintiffs worked in ConAgra's human resources department ("HR"). Ortega was employed as the FMLA Coordinator and was also the assistant to the Benefits Coordinator, Denise Dimas. As FMLA Coordinator, she handled insurance paperwork for production-level employees at the Athens facility and did not generally have access to the computer system containing insurance information on management-level employees. However, as assistant to

---

[1]The Court previously ruled on Plaintiffs' FLSA claims for unpaid overtime compensation. *See* Order on Plaintiffs' Motion for Partial Summary Judgment [Doc. 43] (granting Plaintiffs' Motion for Partial Summary Judgment on their FLSA claims as to liability but finding triable issues of fact regarding damages).

[2]*See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 918, 918-19 (11th Cir. 1993) (for summary judgment purposes the court must view the facts in the light most favorable to the non-moving party and draw all inferences in favor of that party).

[3]The Athens poultry facility was operated by ConAgra Poultry Company, a subsidiary of ConAgra. In June of 2003, ConAgra announced the sale of its poultry company to Defendant Pilgrim's Pride, and in November 2003, Pilgrim's Pride acquired the poultry company's assets and liabilities.

Ms. Dimas, she assisted in handling some aspects of management-level insurance paperwork. Reyna worked as the employment coordinator and was responsible for hiring all non-exempt employees at the Athens facility. At times, Ortega filled in for Reyna.

Plaintiffs reported directly to Angela Colquitt, who was the personnel manager. Colquitt, in turn, reported to Dan Hoggard, who was the Athens complex human resources manager. Hoggard was responsible for all human resources functions at the Athens facility. Hoggard reported to two different managers at ConAgra. From a facility standpoint, Hoggard reported to Andy Harris, who was the Athens complex general manager. From a human resources standpoint, Hoggard reported to Linda Lauer, who was ConAgra's regional human resource director.

Plaintiffs assert that their direct supervisor, Angela Colquitt, mistreated and discriminated against them during their employment.

### Hostile Work Environment

Plaintiffs claim that Colquitt subjected them and other minority employees to an environment hostile to their race and national origin. In support of their hostile work environment claim, Plaintiffs point to racially derogatory comments made by Colquitt as well as alleged discriminatory imposition of rules by her. Specifically, Plaintiffs heard Colquitt refer to Mexicans in general as "wetbacks" and heard her make comments disparaging of Hispanic women in particular, including: "Why are you Hispanics or why are you

Mexicans always wearing those tight pants?"; "Don't you Hispanics know that you all look like clowns [for wearing lots of make-up]?"; and, "Those damn Mexican women are only here to get pregnant or are only here to get money from the company."  In addition to the comments made specifically about Hispanics, Colquitt made other inappropriate and racially derogatory remarks.  Colquitt referred to blacks as "niggers" and suggested that they were lazy, used drugs, and had criminal records.  Plaintiffs state that these types of "racist" comments—both about Hispanics and other minorities—were made "a lot" and "pretty much on a daily basis."

Colquitt also instructed Reyna and Ortega (when she would fill in for Reyna) not to hire Hispanic women because "they will get pregnant so soon within the first year of work and then they will try and get benefits from the company, and it was just lost money."  She instructed Plaintiffs not to hire black people generally because "they weren't going to pass the drug screen and it was just a waste of money for the company," and to avoid hiring men and women over the age of 40 "because they are not going to be able to do the work as well as a younger person."  Reyna stated that if she violated these hiring "rules," Colquitt would verbally reprimand her, and she felt she might lose her job.  Colquitt also instructed Plaintiffs not to socialize with Hispanic employees at ConAgra either at work or outside of work at parties, clubs, churches, or otherwise.  And, unlike the other employees in human resources, Colquitt told

4

Plaintiffs that they had to work certain weekends or they would be terminated. She also refused to allow Plaintiffs to take a week of vacation at one time. Plaintiffs contend that these comments and instructions caused them considerable distress and interfered with their ability to work.

### Fraudulent Practices

Plaintiffs also allege that they were exposed to fraudulent practices that caused them considerable distress. In April or May of 2003, Reyna learned that a maintenance employee, Francisco Hernandez, had an expired Immigration and Naturalization Service form I-9, Employment Eligibility Verification form ("I-9 form") and reported to Colquitt that it was illegal for Hernandez to remain employed.[4] In response, Colquitt asked Reyna to prepare a fake social security card for Mr. Hernandez. Colquitt implied that such action was necessary because Hernandez reported directly to the general manager, Andy Harris, and also worked for Mr. Harris on his farm. Reyna refused to prepare a false social security card, so Colquitt and Denise Dimas prepared the fake card using the copy machine in HR and put it in Mr. Hernandez's file. When Reyna questioned the legality of this conduct, she was threatened with termination. Reyna did not report this incident at that time.

_____

[4] Employers are required to verify the identity and eligibility of all employees working in the United States using the I-9 form. Once completed, the employer must keep the form in the employees' files for INS inspection.

Similarly, in May 2003, Ortega learned of a problem involving the health insurance of J. C. Hernandez (no relation to Francisco Hernandez), a supervisor in the plant. Specifically, Ortega learned that J. C. Hernandez had submitted an insurance change form adding a wife and child to his health coverage; however, he did not provide information substantiating that the individuals he listed were in fact his wife and child. From May through July, in accordance with company policy, Ortega sent Hernandez three letters requesting the missing information, but she received no response. Ortega knew that Colquitt hired J. C. Hernandez's sister as a housekeeper and suspected that the insurance information was false—that the persons listed were, in reality, his sister and nephew. When Ortega asked Denise Dimas, the Benefits Coordinator, about the missing information, Dimas told her that Colquitt would take care of it and not to mention it again.

On August 7, 2003, Ortega received an email message from Dimas indicating that Ortega needed to do a better job of filing the documents in her office. In response, Ortega sent an email message to Dimas and Colquitt with complaints of being overworked. The next day, on August 8, 2003, Colquitt met with Ortega and informed Ortega that she needed to move out of the office she was currently occupying because that room was designated to serve as a conference and training room for HR. At approximately the same time, Reyna was also

instructed that she needed to move out of the office she was occupying.

## **Plaintiffs' Complaints to General Manager Andy Harris**

Plaintiffs were aware of ConAgra's posted anti-harassment policy prohibiting discrimination and harassment in the workplace and instructing any employee "who believes he or she has been the subject of harassment [to] immediately report it to his or her supervisor, department manager or to Nancy Cohen, Director of Human Resources." Plaintiffs also had received the employee handbook which contained ConAgra's Open Door Policy, encouraging employees to report personal as well as job-related problems to management. Plaintiffs further state that Harris maintained an informal policy encouraging employees to come directly to him regarding any problems in the workplace.

During the second week of August 2003, Plaintiffs requested a meeting with Harris, the complex general manager. During their meeting with Harris, Plaintiffs informed him that they were both resigning from employment with ConAgra due to the hostile work environment in which they were forced to work and wanted to know if he would give them a good reference. When asked to explain, Plaintiffs told Harris that Colquitt made it impossible for them to work in HR. Plaintiffs went on to explain Colquitt's inappropriate and racially offensive remarks; her hiring rules and opinions of minorities; her refusal to approve and their failure to receive overtime compensation; issues concerning vacation time; the

7

falsification of J. C. Hernandez's insurance forms; the falsification of Francisco Hernandez's social security card; and the falsification of certain boot vouchers.[5] During the meeting, Harris states that he took notes regarding their concerns. Harris urged Plaintiffs not to quit, to take some vacation time, and promised that he would investigate and the conditions would improve. Following his advice, Plaintiffs did not resign. Ortega took a four-day vacation beginning on August 26, 2003, and Reyna took a four-day vacation beginning on September 2, 2003.

The day after Plaintiffs met with Harris, Harris met with Hoggard, the Athens complex HR manager, and gave Hoggard the alleged notes from his meeting with Plaintiffs.[6] Harris asked Hoggard to investigate Plaintiffs' concerns. Hoggard allegedly conducted an investigation, but the thoroughness of his investigation is in dispute. During the investigation, Hoggard did not interview Plaintiffs. He stated that he involved his corporate HR boss, Linda Lauer, in the investigation, but she was contacted only after

---

[5]ConAgra allowed employees and supervisors in the production area of the plant to get one pair of boots each year at ConAgra's expense. One of Reyna's job duties was to issue vouchers to employees so that they could obtain these boots. On one occasion, Colquitt required Reyna to give her several boot vouchers even though HR employees were not allowed to get boots.

[6]Plaintiffs question whether Harris actually took notes during his initial meeting with them. Plaintiffs point to the fact that his notes were dated September 5, 2003, a date that was not only weeks after the initial meeting took place, but also a date when Reyna was vacationing out of state.

Plaintiffs were suspended.  Also, his notes contained information on events that transpired months after Plaintiffs' termination.

Following Plaintiffs' return from vacation, Colquitt held meetings in which she told the staff that there had been complaints about her.  She allegedly threatened termination of anyone who did not first come to her with such complaints.  She also moved Ortega to the receptionist area, required her to come into work at 5:00 a.m., took away many of her responsibilities, and, according to Plaintiffs, generally became more aggressive and rude.

### **Plaintiffs' Terminations**

On or about Wednesday, September 10, 2003, Harris again met with Reyna regarding her concerns.  During that meeting, Harris told Reyna that he was particularly concerned about the incidents involving the boot voucher, the social security card, and the insurance for J. C. Hernandez.  Harris told Reyna that she should give him whatever proof she had related to these incidents by the following Friday.  Reyna subsequently informed Ortega that she needed documentation related to the falsification of the health insurance.  Ortega typed a letter summarizing the insurance issue involving J. C. Hernandez and provided it to Reyna.  On Friday, September 12, 2003, Reyna put the documentation into an envelope and placed the envelope in Harris's office.

Later that day, Reyna and Ortega were called into separate meetings with Hoggard and Colquitt and given a three day suspension.

The reason for the suspensions, however, is disputed. Defendants contend that Plaintiffs violated ConAgra's confidentiality policy. Defendants state that immediately after Harris received the documentation provided by Plaintiffs, Harris gave it to Hoggard for investigation. Defendants allege that in his review of the documents, Hoggard noticed that the document regarding J. C. Hernandez's insurance coverage was printed out from ConAgra's PeopleSoft computer program, which neither Ortega nor Reyna had access to. Because Plaintiffs did not have computer access rights to obtain this type of health insurance benefits information related to a supervisory-level employee, Hoggard immediately became concerned. He called Plaintiffs into his office and suspended Plaintiffs for three days with pay so that he could investigate the possible breach of confidentiality.

Plaintiffs respond that Hoggard's reasons for suspending Plaintiffs were not due to Plaintiffs' alleged access to the PeopleSoft computer program. According to Plaintiffs, Reyna was suspended for the boot voucher incident. During the suspension meeting, Hoggard told Reyna that the boot voucher information was confidential and should not have been removed from the human resources department. Ortega contends that she understood she was suspended for informing Harris about the problems with J. C. Hernandez's health insurance, not for accessing the PeopleSoft computer program. During her meeting, Hoggard merely held some

10

papers in his hand and told Ortega that she had given information to Harris and did not know if she had done the right thing.

During Plaintiffs' three-day suspension, Hoggard contends he investigated the alleged breach of confidentiality and states he was unable to determine how Plaintiffs had accessed the insurance documentation on the computer screen. Hoggard met with Harris to discuss firing Plaintiffs and received the authority to do so. On Tuesday, September 16, 2003, Hoggard and Colquitt met with Linda Lauer, ConAgra's regional human resources director, in her office in Duluth, Georgia. During this meeting, Lauer agreed with Hoggard's recommendation that Plaintiffs be terminated for violation of ConAgra's confidentiality rules and gave Hoggard approval to terminate Plaintiffs.

The next day, on Wednesday, September 17, 2003, Plaintiffs were again called in to separate meetings with Hoggard and Colquitt and were fired for violation of ConAgra's confidentiality policy because they had provided confidential employee information to Harris. Hoggard provided each Plaintiff with an Employee Performance Notice stating that they were being terminated for possessing and sharing confidential information that they accessed without permission. Plaintiffs refused to acknowledge the violations and refused to sign the discipline forms.

Plaintiffs claim that, with the exception of the boot voucher in the case of Reyna, at neither meeting did Hoggard show Plaintiffs any

documents that would support his claim that they breached confidentiality. They were never shown any documents concerning the insurance issue with J. C. Hernandez, and they thought they were being fired for the boot voucher and for merely disclosing the information they had learned about J. C. Hernandez.

On October 28, 2003, Plaintiffs filed a Charge of Discrimination with the Equal Employment and Opportunity Commission ("EEOC"). On November 4, 2003, Plaintiffs filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that Plaintiffs had been terminated in violation of, among other things, their rights under the Sarbanes-Oxley Act. After receiving a notice of a right to sue from the EEOC and OSHA, Plaintiffs commenced this action.

During discovery, Defendants produced a computer generated document on J. C. Hernandez that they allege Ortega accessed, shared with Reyna, and gave to Harris. It is this document, according to Defendants, that formed the basis for their termination of Plaintiffs' employment. Plaintiffs state they never saw this computer printout prior to its production during discovery in this lawsuit.

### SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Johnson v.*

12

*Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. *See id.* at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. *See id.* at 254-55; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material

fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex*, 477 U.S. at 323.

## DISCUSSION

### A.  Hostile Work Environment Claims

Plaintiffs assert that Colquitt's treatment of Hispanic and minority employees and applicants, including themselves, created a racially hostile work environment in violation of Title VII and the Civil Rights Act of 1991. For Plaintiffs to recover on their hostile work environment claims, they must prove: (1) that they belong to a protected group; (2) that they have been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic (here, race and national origin); (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory and abusive working environment; and (5) a basis for holding the employer liable under either a theory of vicarious or direct liability. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000).

14

Defendants concede for purposes of this motion the existence of the first two elements—that Plaintiffs belong to a protected group and that they were subject to unwelcome harassment. However, Defendants contend that Plaintiffs fail to establish the remaining three necessary elements. For the following reasons, the Court rejects Defendant's arguments and finds that genuine issues of material fact exist regarding Plaintiffs' hostile work environment claims. Therefore, summary judgment is not appropriate on these claims.

*1. Harassment Based on a Protected Characteristic*

It is clear that sufficient evidence exists from which a reasonable jury could conclude that the alleged harassment was based upon Plaintiffs' race. Colquitt's inappropriate behavior included references to Hispanic employees as "wetbacks"; comments about Hispanic women only working at the company to get pregnant or to get money; and rules instructing Plaintiffs to discriminate against members of their own race and gender as well as other minorities. Thus, the Court finds that Plaintiffs satisfy this element of their claims.

*2. Harassment Sufficiently Severe or Pervasive*

The evidence produced by Plaintiffs is also sufficient to create genuine issues of material fact as to the severity and pervasiveness of the alleged harassment and hostile conduct. The requirement that the harassment be both severe and pervasive includes both a

subjective and an objective component. To satisfy this requirement, Plaintiffs must produce evidence from which a reasonable juror could conclude that (1) Plaintiffs subjectively perceived their work environment to be hostile or abusive and (2) a reasonable person would find the work environment hostile or abusive. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

### a. Subjective Component

Defendants first argue that no reasonable jury could find that Plaintiffs subjectively perceived their work environment to be hostile or abusive because (1) they had been working under Colquitt for over a year before they made any complaint of harassment, and (2) Plaintiffs neither told Colquitt that her comments were offensive nor asked her to stop making such comments. However, the law is clear that "[h]arassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501 (11th Cir. 2000). Here, Plaintiffs have testified that they perceived Colquitt's behavior as hostile and abusive, that the behavior caused them considerable distress, and it interfered with their ability to work. While a jury may ultimately accept Defendants' arguments and find against Plaintiffs, the Court finds that Plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to the subjective element.

### b. Objective Component

16

In evaluating the objective severity of the harassment, the Court considers four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. Proof of each factor is not required to find that the objectionable conduct is sufficiently severe or pervasive; rather, the Court must consider the alleged conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999); *see also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (Court must "examine and consider all of the behavior and [racially motivated] conduct . . . collectively in determining whether it meets the severe or pervasive requirement."). "Generally speaking, isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Walton v. Johnson & Johnson Serv., Inc.*, 347 F.3d 1272, 1285 n.12 (11th Cir. 2003) (quotation and citation omitted). Furthermore, Title VII is not a "general civility code." Gupta, 212 F.3d at 583. However, there is no magic number of racially offensive comments that must be made in order for harassment to create a hostile work environment. *See Miller*, 277 F.3d at 1276.

Plaintiffs allege the following facts in support of their hostile work environment claims:

(1) Colquitt instructed Plaintiffs not to hire Hispanic female applicants because they will "just get pregnant";

(2) Colquitt instructed Plaintiffs not to hire "niggers" because "they are lazy and never show up to work";

(3) Colquitt made "racist" comments in the presence of Plaintiffs on a "daily basis":

(a) "Why are you Hispanics or Mexicans always wearing those tight pants?"

(b) "Don't you Hispanics know that you all look like clowns [for wearing lots of makeup]?"

(c) "Damn Mexican women are only here to get pregnant or only here to get money from the company."

(d) references about Hispanic employees and applicants being "wetbacks" and blacks being "niggers";

(e) references that black people were lazy, used drugs, and had criminal records.

(4) Colquitt instructed Plaintiffs not to socialize with Hispanic employees at ConAgra either at work or outside of work;

(5) Colquitt restricted Plaintiffs' vacation time;

(6) Colquitt forced Plaintiffs to work on Saturdays; and

(7) ConAgra failed to pay Plaintiffs for overtime work.

Construing the evidence in favor of Plaintiffs as required at this stage of the proceedings, the Court finds that genuine issues of material fact exist regarding the objective severity and pervasiveness of the alleged harassment.

*(I)  Frequency & Severity*

Regarding the frequency and severity of the harassment, Plaintiffs testified that Colquitt made racially derogatory comments "a lot" and on "a daily basis."  They reported that Colquitt made "constant demeaning comments."  This is not a case where Plaintiffs complain about a few offhand comments or random, isolated incidents occurring over several years.  Rather, the alleged conduct here occurred repeatedly and constantly for the fifteen to eighteen months Plaintiffs worked under Colquitt.  Furthermore, it is undisputed that Colquitt directly supervised Plaintiffs and that they all worked in the same area, interacting on a daily basis. *See Miller*, 277 F.3d at 1276 (finding frequency element met in part because plaintiff's duties required him to go into the service area and interact with the harasser on a daily basis).

Likewise, a reasonable jury could conclude that Colquitt's harassment was sufficiently severe.  Colquitt not only made racist remarks directly about Hispanics and Hispanic women, but she also imposed hiring "rules" requiring Plaintiffs to discriminate directly against Hispanic women, a group to which Plaintiffs belonged. Colquitt similarly made racist remarks about, and imposed hiring

19

restrictions upon, African Americans, contributing to the overall hostility of the work environment for minority employees. Although Plaintiffs admit that none of Colquitt's remarks were made directly about Plaintiffs, they were spoken directly to Plaintiffs or in their presence. Moreover, Colquitt was Plaintiffs' supervisor—a person who had direct authority to adversely affect their employment. This relationship makes the harassment particularly actionable.

### (ii) Physically Threatening or Humiliating Conduct & Unreasonable Interference with Job Performance

Although overt physically threatening behavior is absent in this case, a reasonable jury could conclude from the evidence that Plaintiffs were humiliated by Colquitt's conduct. Plaintiffs testified that Colquitt's actions made them feel angry, depressed, "inferior to other employees simply because of [their] race," and "like less of a person." When the evidence is viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that Colquitt's harassment unreasonably interfered with Plaintiffs' job performance. Reyna testified that when she would "violate" the "hiring rules" and hire a Hispanic woman or an African American, Colquitt would reprimand her. Plaintiffs also stated that they did not complain or report Colquitt's conduct until their meeting with Harris because they were afraid of losing their jobs. Plaintiffs testified further that because of Colquitt's conduct, it became very

stressful to work in HR, and they ultimately went to Harris to resign because of the hostile environment—because Colquitt "made it impossible for [them] to work in the Human Resources Department."

Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that under the totality of the circumstances, Plaintiffs have produced sufficient evidence from which a reasonable jury could conclude that Colquitt's alleged conduct was sufficiently severe and pervasive to establish a racially hostile work environment. The next step in the analysis is to determine whether a legal basis exists for holding ConAgra liable for Colquitt's alleged harassment.

*3. Employer Liability*—Faragher/Ellerth *Defense*[7]

Even if an employee establishes the existence of a hostile work environment that altered the terms and conditions of employment, the employer is not automatically liable. An employer may raise an affirmative defense, commonly referred to as the *Faragher/Ellerth* defense. To prevail on this defense, the employer must prove: (1) that the employer exercised reasonable care to prevent the harassment and reasonable care to correct promptly the harassment; and (2) that the plaintiff unreasonably failed to take advantage of

---

[7]Plaintiffs also seem to assert that ConAgra is strictly liable for Colquitt's alleged harassment based on a tangible employment action theory. Under a tangible employment action theory, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee—such as discharge, demotion, or undesirable reassignment—the employer is automatically held vicariously liable for the harassment. *Frederick v. Sprint/United Mgmt Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001) (citations omitted). Even assuming Plaintiffs could proceed on such a theory in this case, Plaintiffs have not presented sufficient evidence for a reasonable jury to find that there is a causal link between the alleged harassment and Plaintiffs' terminations and therefore cannot establish employer liability based on an adverse tangible employment action theory. *See Hulsey*, 367 F.3d at 1245 (the essential aspect of the tangible employment action theory is that the tangible adverse employment action, *i.e.*, a plaintiff's termination, was causally related to the alleged harassment) (citing *Ellerth*, 524 U.S. at 753); *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006).
Plaintiffs have raised no issues of fact establishing that they were terminated (as opposed to being harassed) *because of* their race or national origin. Moreover, there is no evidence that Colquitt, the harassing supervisor, made the decision to terminate Plaintiffs or even recommended Plaintiffs' discharge. *See Walton v. Johnson & Johnson*, 347 F.3d 1272, 1282 n.7 (11th Cir. 2003) (no evidence that the harassing supervisor "played a role in the decision to terminate [plaintiff]."). Because Colquitt's harassment is not causally related to Plaintiffs' termination, Plaintiffs cannot establish that a tangible employment action was taken. Because no tangible employment action was taken, ConAgra may raise the affirmative *Faragher/Ellerth* defense. *See Ellerth*, 524 U.S. at 765.

any preventive corrective opportunities provided by the employer or to avoid harm otherwise. *See generally Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).

ConAgra asserts that it is protected by the *Faragher/Ellerth* defense because ConAgra had in place an anti-harassment and discrimination policy that was distributed to all employees, including Plaintiffs, and Plaintiffs unreasonably failed to follow the reporting procedures as required under the policy. The Court, however, finds that genuine issues of material fact exist which preclude summary judgment.

    a.   *Reasonable Care to Prevent and Promptly Correct Harassing Behavior*

ConAgra argues that it satisfies the first element of the defense because it had in place an adequate anti-harassment policy that included a complaint procedure.[8] The Court finds that

_____

[8]ConAgra's policy prohibiting discrimination and harassment in the workplace provides, in pertinent part:

    Consistent with ConAgra Foods' continuing belief that the hiring of employees and their progress within the company should be based solely on qualifications and demonstrated performance, I wish to make clear that ConAgra Foods is committed to maintaining a work environment that is free of discrimination. In keeping with this commitment, our company

23

Defendant's anti-harassment policy satisfies the "prevent" prong of the defense. The policy "enabled employees to bypass harassing supervisors and provided several avenues for employees to report [] harassment." *Olsen v. Lowe's Home Ctr., Inc.*, 130 Fed. Appx. 380, 389 (11th Cir. 2005) (citations omitted). The Court also notes, however, that while proof that an employer has promulgated an anti-harassment policy with a complaint procedure is relevant in determining whether an employer may escape liability, the mere existence of a policy alone is not sufficient. *See Frederick*, 246 F.3d at 1314. ConAgra must also show that it acted in a reasonably prompt manner in responding to Plaintiffs' complaints. *See id.*

The Court finds that genuine issues of material fact exist as to whether ConAgra acted reasonably to correct the harassing behavior. First, taking the evidence in the light most favorable to Plaintiffs, a jury could find not only that ConAgra's investigation of Plaintiffs' complaints was inadequate, but also that ConAgra failed to investigate Plaintiffs' complaints at all prior to their termination. For example, Harris states that he took notes during

---

will not tolerate harassment of its employees by anyone, including managers, co-workers, vendors or customers of ConAgra Foods.

. . .

All ConAgra Foods employees are responsible for helping assure that we avoid harassment. An employee who believes he or she has been the subject of harassment should immediately report it to his or her supervisor, department manager or to Nancy Cohen, Director of Human Resources.

the meeting in which Plaintiffs lodged their complaints; however his notes are dated September 5, 2003, weeks after the initial complaint and a date on which Reyna was vacationing out of state. In addition, Dan Hoggard states that he thoroughly investigated Plaintiffs' complaints, however, he did not interview Plaintiffs, and, although he states he involved his corporate HR boss, Linda Lauer, in the investigation, Lauer was only contacted for advice regarding their terminations after Plaintiffs had been suspended. Furthermore, although Hoggard claims to have investigated Plaintiffs' complaints before terminating Plaintiffs, his notes give no indication as to when the matters were actually investigated inasmuch as they include information on events occurring months after their terminations. A reasonable jury could find from this evidence that Defendants do not meet the "correct" prong of the defense. *See Walton*, 347 F.3d at 1288 (noting that the employer's inadequate investigation into a complaint is relevant if the substantive measures taken by the employer are not sufficient to address the harassing behavior).

The Court also finds that a reasonable jury could conclude that ConAgra provided no remedial measures to stop the harassment or ensure that the harassment no longer occurred. Evidence exists that Colquitt's harassment continued even after Plaintiffs' complaints. Following Plaintiffs' return from their respective vacations, Colquitt held meetings in which she told the staff that there were complaints about her. She allegedly threatened termination for

anyone who did not first come to her with such complaints. Furthermore, according to Plaintiffs, Colquitt moved Ortega to the receptionist area, required her to come to work at 5:00 a.m., took away much of her responsibility, and generally, became more aggressive and rude. From this evidence, a reasonable jury could conclude that Defendants failed to meet the "correct" prong of the defense.

### b. Reasonable Care to Avoid Harassment

The Court also finds genuine issues of material fact exist with regard to the second element of the *Faragher/Ellerth* defense. Under the second element, ConAgra must prove that Plaintiffs unreasonably failed to take advantage of ConAgra's preventative or corrective opportunities or to avoid harm otherwise. Defendants contend that Plaintiffs unreasonably failed to take advantage of the complaint procedure set forth in ConAgra's anti-harassment policy in that they failed to immediately report the harassment to one of the persons designated in the policy—to "[their] supervisor, department manager, or to Nancy Cohen, Director of Human Resources."

The Eleventh Circuit has identified two elements that must be satisfied in "defining the contours of what it means to reasonably use the complaint procedures and, thereby, properly report [] harassment." *Olsen*, 130 Fed. Appx. at 389. First, Plaintiffs must have complained to the appropriate person at ConAgra (in this instance, Harris) and second, if Harris is the appropriate person,

26

Plaintiffs' conversations with Harris must be sufficient to put ConAgra on notice of the harassment. *Id.* at 389-90.

### *(I) Appropriate Person*

The Court finds a genuine issue of material fact as to whether Harris was an appropriate person for Plaintiffs to report harassment. First, a jury could conclude that Harris was an appropriate person under ConAgra's formal Open Door Policy. ConAgra's Open Door Policy states in part:

> The Company recognizes that associates, from time to time, need or desire counseling on personal as well as job related matters. These types of problems can adversely affect morale, job performance, and a person's normal work habits. With this in mind, the management makes itself available to, and encourages any associate who wishes to discuss a personal problem, to do so with the knowledge that any conversation of a personal nature will be held in complete confidence. . . . The Open Door Policy and subject counseling sessions are designed to help associates so that any personal problem(s) they have will not affect other associates or hinder their own performance on-the-job.

A reasonable jury could conclude that, pursuant to this formal policy, it was proper for Plaintiffs to report the harassment to Harris, the general manager of the Athens plant. Second, a reasonable jury could conclude that Harris was an appropriate person pursuant to his informal open door policy encouraging all employees, even hourly employees, to complain directly to him.

27

### (ii)   Adequate Notice

If Harris is found to be an appropriate person for Plaintiffs to report harassment, the Court finds Plaintiffs' conversations with Harris sufficient to put ConAgra on notice of the harassment. Plaintiffs explained fully and in detail the alleged harassment, in a professional capacity, during a meeting with the general manager in his office. *But see Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000) (In finding that the employer did not have adequate notice of the harassing behavior, the court pointed out that the plaintiffs complained to mid-level managers, did not fully explain the "full dimensions" of their harassment, and did not approach the mid-level managers "in a professional capacity to request assistance with correcting [the harasser's] behavior.").

Defendants rely on *Madray* to support their contention that Plaintiffs' failure to complain to one of the persons specified in the harassment policy constitutes an unreasonable failure to comply with preventive measures provided by the employer.  However, the facts in *Madray* are distinguishable from the case at bar.  The *Madray* court "rested its decision primarily on the fact that the persons to whom the employee complained were not authorized or designated persons to accept complaints under the employer's [] harassment policy."  *Olsen*, 130 Fed. Appx. at 1391 n.23 (citing *Madray*, 208 F.3d at 1299-300).  Here, the Court has found that a genuine issue of material fact exists as to whether Harris was the appropriate person

to receive harassment complaints. Moreover, the plaintiffs in *Madray* failed to utilize the complaint procedure set forth in the open door policy. *Id.* at 1302 (Policy required that "if a problem is not resolved, the employee should go to the next highest level of management, to the top level if necessary."). Here, not only did ConAgra's Open Door Policy provide no such structured procedure for resolving problems, but Harris's informal open door policy provided an alternative avenue for Plaintiffs to report problems.

In summary, the Court finds that genuine issues of material fact exist regarding both elements of the affirmative defense—(1) whether ConAgra acted reasonably to correct promptly the harassing behavior, and (2) whether Plaintiffs unreasonably failed to take advantage of ConAgra's preventative or corrective opportunities. Accordingly, Defendant's Motion for Summary Judgment is denied on Plaintiffs' hostile work environment claims.

**B. Retaliation Claims**

Defendants also move for summary judgment on Plaintiffs' retaliation claims under Title VII, the ADEA, and the FLSA. Plaintiffs allege that Defendants terminated their employment in retaliation for the following protected conduct: informing Andy Harris of (1) the discrimination in hiring on account of race and age, (2) the racially hostile work environment, (3) the fraudulent conduct involving J. C. Hernandez's health insurance and Francisco Hernandez's I-9 forms, and (4) the failure to pay overtime. Because

Plaintiffs rely solely upon circumstantial evidence, the Court applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). *See e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986).

Under the *McDonnell Douglas* framework, in order to prevail, a plaintiff must first create an inference of discrimination by establishing a prima facie case. *Goldsmith*, 996 F.2d at 1162-63. Once the plaintiff sets out a prima facie case, a presumption of discrimination arises, and the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the employer's conduct. *Id.* If the employer successfully rebuts the plaintiff's prima facie case, the presumption of retaliation is eliminated, and the plaintiff must then show that these reasons are pretextual, or present other evidence to show that retaliatory intent was more likely the cause of the employer's action. *Id.* If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the employer's reasons are pretextual, the employer is entitled to summary judgment on plaintiff's claims. *Id.*

To establish a prima facie case of retaliation, Plaintiffs must show: (1) that they engaged in statutorily protected expression; (2) that they suffered an adverse employment action; and (3) that

30

there is some causal relationship between these two events. *See,*
*e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453-54 (11th Cir.
1998). Defendants concede for purposes of summary judgment that
Plaintiffs can establish a prima facie case of retaliation.
Defendants argue, however, that no reasonable jury could find that
ConAgra's legitimate, non-retaliatory reason for terminating
Plaintiffs is a mere pretext for retaliation. The Court disagrees
and finds that genuine issues of material fact exist to be tried.

Defendants state that Plaintiffs were terminated due to their
breach of ConAgra's confidentiality policy prohibiting the use or
disclosure of any confidential information when Plaintiffs provided
Mr. Harris with the PeopleSoft printout on J. C. Hernandez obtained
from a computer system to which Plaintiffs did not have access.
Plaintiffs respond that this reason is merely pretext—that the real
reason for Plaintiffs' terminations were their protected activities.

Plaintiffs raise sufficient issues of material fact for a jury
to find Defendants' proffered non-retaliatory reason for terminating
Plaintiffs is pretextual. In their sworn deposition testimony,
Plaintiffs deny ever having seen the computer printout for which they
were purportedly fired for possessing, prior to its production in
this lawsuit. Plaintiffs testified they were never questioned about,
nor shown, the PeopleSoft printout. Furthermore, the PeopleSoft
document was printed on August 28, 2003—a date on which Ortega was on
vacation, and a date that was two weeks prior to Harris's request for

31

the information, and two weeks after Plaintiffs' initial report of the scheme to Harris. A reasonable jury could find that Plaintiffs would not access the program after having already reported the facts to Harris and without any direction to produce more information. Moreover, a reasonable jury could find that the reasons Defendants gave for discipline at the time of termination, or soon thereafter, conflict with the reasons Defendants now assert. For example, Hoggard reprimanded Reyna only for the alleged confidentiality surrounding the work-boot vouchers. Similarly, Ortega was told that her termination was for disclosing information about J. C. Hernandez (not for having accessed PeopleSoft). Finally, even if Plaintiffs did access the PeopleSoft system (which they adamantly deny), there are questions as to whether they, in fact, breached the confidentiality policy, and if so, whether, in light of Harris's request for further information, they would have been fired. The confidentiality policy provides for an exception to disclosures where "required by [an employee's] duties to the Company." A jury could find that Plaintiffs disclosed the information out of a perceived duty to the company and at the request of the general manager of the Athens complex. All of this evidence points to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in ConAgra's proffered reason for terminating Plaintiffs so that summary judgment is inappropriate. *Combs v. Plantation Patterns*, 106

F.3d 1519, 1538 (11th Cir. 1997). Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' retaliation claims is denied.

## C. **Sarbanes-Oxley Act Claims**

Plaintiffs also allege that ConAgra terminated their employment in retaliation for activities protected under Section 806 of SOX.[9] Section 806 protects "whistleblowers" of publicly traded companies, by prohibiting employers from discriminating or retaliating against an employee who engages in protected activity under the Act. Section 806 was enacted, in pertinent part, as follows:

> § 1514A. Civil action to protect against retaliation in fraud cases
>
> (a) Whistleblower protection for employees of publicly traded companies.–No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781) , or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee–
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provide to or the investigation is conducted by–

_____

[9]Section 806 of SOX is specifically entitled the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002 (Public Law 107-204), 18 U.S.C. § 1514A, ("SOX" or "Act") as implemented by 29 C.F.R. Part 1980.

        (A) a Federal regulatory or law enforcement agency;

        (B) any Member of Congress or any committee of Congress; or

        (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

    (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

  (B) ENFORCEMENT ACTION.--

    (1) IN GENERAL. –A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c), by –

        (A) filing a complaint with the Secretary of Labor; or

        (B) if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

18 U.S.C. § 1514A.

    To establish a prima facie case under SOX, Plaintiffs must show that (1) they engaged in protected activity; (2) the employer knew of the protected activity; (3) they suffered an unfavorable personnel action; and (4) circumstances are sufficient to suggest the protected

activity was a contributing factor in the unfavorable action. 49 U.S.C. § 42121(b)(2)(B)(iii); *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1375 (N.D. Ga. 2004) (citations omitted). Temporal proximity is sufficient to raise an inference of causation. *Collins*, 334 F. Supp. 2d at 1375-76. The employer may avoid liability if it can demonstrate by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv); *Collins*, 334 F. Supp. 2d at 1376.

Plaintiffs contend they were terminated in retaliation for reporting two incidents of fraud within the plant to Harris. First, they told Harris about a "fraudulent insurance scheme" by a supervisory employee, J. C. Hernandez, perpetrated with the approval of their HR supervisor, Angela Colquitt, whereby Hernandez falsely requested that individuals he identified as his wife and son (who were in fact his sister and nephew) be added to his company-provided health insurance as dependents. Second, they told Mr. Harris that Colquitt and Denise Dimas produced a fake social security card for an employee, Francisco Hernandez, in order to satisfy I-9 form requirements. Plaintiffs allege these fraudulent activities necessarily involved the use of mail or the internet, and thus the reporting of this mail (section 1341) and wire (section 1343) fraud is protected activity under SOX.

In their Motion for Summary Judgment, Defendants first contend that Plaintiffs cannot sustain their SOX claims because they did not engage in protected activity within the meaning of SOX. Additionally, Defendants argue that even assuming Plaintiffs engaged in protected activity within the meaning of SOX, Plaintiffs' SOX claims must fail because Defendants can establish that Plaintiffs would have been terminated regardless of the activity. For the reasons discussed below, the Court finds summary judgment inappropriate for Defendants.

To establish a violation of SOX, Plaintiffs must first show by a preponderance of the evidence that they engaged in "protected activity." SOX protects employees who provide information which the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 8 U.S.C. § 1514A(a)(1). Defendants argue that the only "fraud" reports covered by this provision are those "relating to fraud against shareholders." Therefore, Defendants maintain that since Plaintiffs' reports of mail fraud and wire fraud did not relate to "fraud against shareholders," those reports are not protected activity under the statute. Plaintiffs respond that a plain reading of the statutory provision makes clear that it applies to an employee's reporting of mail and/or wire fraud

36

regardless of whether that fraud relates to fraud against shareholders.

A conflict exists among the various courts which have addressed the issue as to whether this statutory provision limits protected activity under SOX to fraud "against shareholders." The Eleventh Circuit has not yet addressed the issue. *Compare Livingston v. Wyeth, Inc.*, 2006 WL 2129794, *10 (M.D. N.C. July 28, 2006) ("To be protected under Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud."); *Bishop v. PCS Admin. (USA), Inc.*, 2006 WL 1460032, *9 (N.D. Ill. May 23, 2006) (finding that the phrase "relating to fraud against shareholder" must be read as applying to all violations enumerated under section 806); *Marshall v. Northrup*, 2005-SOX-0008, 2005 WL 4889013, *2 (ALJ June 22, 2005) ("Protected activity is defined under SOX as reporting an employer's conduct which the employee reasonably believes constitutes a violation of the laws and regulations related to fraud against shareholders."); *Wengender v. Robert Half Int'l Inc.*, 2005-SOX-59, 2006 WL 3246887, *11 (ALJ March 30, 2006) ("SOX does not apply to . . . general allegations of fraud. . . . Rather, applicability of SOX is limited to specifically enumerated laws or regulations related to fraud against shareholders."); *with Collins*, 334 F. Supp. 2d at 1376 ("The threshold is intended to include all good faith and reasonable reporting of fraud."); *Walton v. Nova Inf. Sys.*, 2005-SOX-1076; 2006-

37

SOX-18 (ALJ March 29, 2006) (rejecting argument that report of violation or rule or regulation of the SEC must relate to fraud against shareholders).

In determining whether SOX only protects an employee's reporting of "shareholder" fraud, the Court begins with the language of the statute itself. *See Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000). The Court presumes that "a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. German*, 503 U.S. 249, 253-54 (1992). If the words in the statute are plain and unambiguous, judicial inquiry is complete. *Id.* Only if the plain-meaning of the statute "produces a result that is not just unwise but is clearly absurd" will the Court not abide by the plain-meaning of the statutory text. *CBS Inc. v. Prime Time 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001). It is unnecessary (and inappropriate) to rely upon the legislative history of a statute to derive Congress' intent when that intent is readily revealed by a plain reading of the statute. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1167 (2003) (citing *Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000)).

The Court finds section 806 to be clear. Thus, fidelity to the plain meaning of the provision is required. The pertinent language of section 806 states that a publicly traded company may not retaliate against an employee who provides information that employee "reasonably believes constitutes a violation of section 1341 [mail

38

fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law *relating to fraud against shareholders*." 18 U.S.C. § 1514A(a)(1) (emphasis added). The statute clearly protects an employee against retaliation based upon that employee's reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of the company. The Court rejects Defendants' interpretation that the last phrase of the provision, "relating to fraud against shareholders," modifies each of the preceding phrases in the provision. Defendants seek to redraft the statute to read that the employee is protected only if he reasonably believes that the conduct constitutes a "violation of section 1341 [mail fraud] 'relating to fraud against shareholders,' section 1343 [wire fraud] 'relating to fraud against shareholders,'" etc.

Defendants' redrafting of the statute conflicts directly with the "doctrine of the last antecedent." That rule of statutory construction requires that the phrase "relating to fraud against shareholders" be applied only to the last antecedent, which is "any provision of Federal law." Thus, the statute protects reports of "mail fraud" and "wire fraud" in addition to "any provision of Federal law relating to fraud against shareholders." Under the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses (here, the relative clause "relating to fraud

against shareholder") are to be applied to the words or phrase immediately preceding them (here, "any provision of Federal law"), and are not to be construed as extending to or including others more remote (here, "section 1341 [mail fraud], 1343 [wire fraud]...."). *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *Bingham v. United States*, 724 F.2d 921, 926 n.3 (11th Cir. 1984) (citation omitted).

Defendants' proposed interpretation also conflicts with the supplementary rule that "[w]here the modifier *is* set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' teaches that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent." *Bingham*, 724 F.2d at 926 n.3 (citation omitted). Here, the drafters did *not* set off "relating to fraud against shareholders" with a comma. Instead, they chose to set off from the preceding phrases the entire last phrase, "any provision of Federal law relating to fraud against shareholders," with a comma. This indicates the drafters' intent that this entire last phrase stand alone rather than intending for a part of it to be stretched to modify each of the phrases preceding the comma.

Although the doctrine of the last antecedent "is not absolute and can assuredly be overcome by other indicia of meaning, [the Supreme Court has] said that construing a statute in accord with this rule is quite sensible as a matter of grammar." *Barnhart*, 540 U.S. at 26 (citations and internal quotations omitted); *see also, Bingham*,

724 F.3d at 926 n.3 (The doctrine of the last antecedent and its supplementary rule of punctuation are "not absolute rules."). Here, the Court finds no other indicia of meaning in the statute. If the drafters meant for section 806 to only protect employees who report fraud against shareholders, then they could have easily done so by inserting a comma before "relating to fraud against shareholders." The drafters, however, did not do so. Therefore, the Court finds that reporting alleged violations of mail fraud or wire fraud does not have to relate to shareholder fraud in order to be protected activity under the statute. Accordingly, Plaintiffs' reports of fraud in this case constitute protected activity under SOX.

The Court further finds that genuine issues of material fact exist as to whether Plaintiffs "reasonably believed" that the conduct they reported constituted mail and/or wire fraud. Additionally, the Court finds that genuine issues of material fact exist as to whether they suffered unfavorable personnel actions as a result of reporting such fraudulent activity and whether those actions would have been taken in the absence of their reporting of such activity. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' SOX claims is denied.


**D.     State Law Claims**

Defendants also seek summary judgment on Plaintiffs' state law claims for negligent retention and punitive damages. Plaintiffs allege that ConAgra wrongfully retained Colquitt when it "knew, or in the exercise of reasonable care should have known" of Colquitt's "propensities" to "violate the law [to] commit acts of discrimination and fraud" and to commit "willful violations of law." (First Am. Compl. ¶¶ 99-100.) Plaintiffs further allege that ConAgra's wrongful retention of Colquitt entitles them to an award of punitive damages.

In order to sustain a claim for negligent retention, Plaintiffs must show that ConAgra knew or should have known of Colquitt's propensity to discriminate, harass, and commit fraud, and that it was foreseeable that Colquitt would engage in such misconduct. *See Cox v. Brazo*, 165 Ga. App. 888, 889, 303 S.E.2d 71, 73 (Ct. App. 1983). Plaintiffs have identified absolutely no such evidence, and their conclusory allegations do not support their negligent retention claims. Because Plaintiffs have provided no evidence to show that ConAgra knew or should have known of Colquitt's propensity to discriminate, Defendants are entitled to summary judgment on Plaintiffs' claims for negligent retention.

Because Plaintiffs' negligent retention claims fail, their state law claims for punitive damages also fail. *See e.g., Bank One, N.A. v. American*, 271 Ga. App. 483, 486, 610 S.E.2d 103, 106 (Ct. App. 2005) (claim for punitive damages must fail where underlying tort claim was dismissed); *Clarke v. Cox*, 197 Ga. App. 83, 84, 397

42

S.E.2d 598, 600 (Ct. App. 1990) ("[P]unitive damages are not supportable where the tort is not proved."). Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' state law claims is granted.

E.  **FLSA Claims**

Defendants also move for summary judgment on Plaintiffs' FLSA Claims for unpaid overtime compensation. This Court has addressed these claims in its previous Order on Plaintiffs' Motion for Partial Summary Judgment, wherein the Court denied Defendants' motion and granted Plaintiffs' motion as to liability only [Doc. 43].

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. 30] is granted in part and denied in part.

IT IS SO ORDERED, this 11th day of June, 2007.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE